**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| NPR INVESTMENTS, LLC, BY AND THROUGH NELSON J. ROACH, A NOTICE PARTNER | § § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CV 5:05-CV-219-TJW |
| UNITED STATES OF AMERICA, | § § | |
| *Defendant*. | § § § | |

**MEMORANDUM OPINION AND ORDER**

This case is a Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") partnership proceeding under Section 6226 of the Internal Revenue Code.[1]  Plaintiff NPR Investments, LLC ("NPR") filed this lawsuit seeking readjustment of certain items determined in the Internal Revenue Service's Notice of Final Partnership Administrative Adjustment (FPAA) pursuant to 26 U.S.C. § 6226.  The Court held a bench trial from March 8 to March 10, 2010.  The parties submitted post-trial briefs on the issues raised in the bench trial.  The Court issues the following memorandum opinion and order, which constitutes the Court's findings of fact and conclusions of law.  Fed. R. Civ. P. 52.  For the following reasons, the Court concludes that the second notice of FPAA is valid and the taxpayers are therefore liable for the taxed owed; however, the Court also concludes that the taxpayers are not liable for the penalties assessed against them.

---

[1] All statutory references are to the Internal Revenue Code (Title 26, U.S.C.) unless otherwise noted.

## I.    BACKGROUND

### A.    The Participants

Harold W. Nix ("Nix"), Charles C. Patterson ("Patterson"), and Nelson J. Roach ("Roach") (collectively the "Taxpayers") are long-time partners in the law firm of Nix, Patterson & Roach, LLP (the "Law Firm"), located in Daingerfield, Texas. The law firm primarily handles plaintiffs' contingency fee cases and enjoys a reputation for being a premier plaintiffs' trial law firm. Messrs. Nix, Patterson, and Roach are partners in NPR, formed for various investment purposes in August 2001.[2] NPR invested in offsetting foreign currency digital options that created tax losses of approximately $65 million for the Taxpayers by entering into transactions that form the basis of this lawsuit. The IRS has characterized these transactions as "Son of BOSS" transactions, and accordingly, is seeking to recover penalties from the Taxpayers.[3]

### B.    The Transactions at Issue

In 2001, the Taxpayers expressed to Mr. Sid Cohen ("Cohen"), their personal CPA at Pollans & Cohen, an interest in investing in foreign currencies because investments in foreign

---

[2] Although the Court's findings of fact are based on the entire record, where feasible, the Court has cited to particular portions of the record which support, directly or implicitly, those findings. Citations to the testimony are made to the volume and page number of the reporter's transcript. Other citations are made to the exhibits offered by the parties.

[3] "BOSS" is an acronym for "Bond and Option Sales Strategy" and refers to an abusive tax shelter. Son of BOSS is a variation of the slightly older BOSS tax shelter. A Son of BOSS shelter may take many forms, but common to them all is the transfer to a partnership of assets laden with significant liabilities claimed to be contingent. A Son of BOSS transaction uses a series of contrived steps in a partnership interest to generate artificial tax losses designed to offset income from other transactions. In IRS Notice 2000-44 ("Tax Avoidance Using Artificially High Basis"), which was published on September 5, 2000, the IRS alerted taxpayers that the Son of BOSS scheme had been "listed" as an abusive tax shelter. *See generally Kornman & Associates, Inc. v. United States*, 527 F.3d 443, 446 n.2 (5th Cir. 2008).

currency carried the possibility of returns not achievable in traditional investments. (Tr. I at 143.)[4]  When the Taxpayers expressed their interest in investing in foreign currencies to Cohen, there was no discussion of tax benefits. (Tr. I at 143-44.)  Cohen introduced the Taxpayers to the Diversified Group, Inc. ("DGI") in the summer of 2001 because DGI was offering an investment involving options in foreign currencies. (Tr. I at 144-45.)  Cohen described the foreign currency option investment being offered by DGI as "risky" but also pointed out to the Taxpayers that they had the "potential to make a lot of money on it." (*Id.*)  On August 28, 2001, Nix and Patterson each set up a single member limited liability company ("SMLLC").  (P-Exh. 26 at PC06319; P-Exh. 27 at NPR002188.)  Nix and Patterson each funded their SMLLCs with $625,000. (*Id.*)  On that same day, August 28, 2010, DGI and Alpha Consultants Inc. ("Alpha") formed NPR and became its co-managers.  (P-Exh. 26 at PC06319.)

At the Taxpayers' direction, Cohen set up a meeting with DGI and R.J. Ruble ("Ruble"), a lawyer with the law firm Sidley, Austin, Brown & Wood LLP ("Sidley Austin"), in New York in October of 2001.  (Tr. I at 145.)  The meeting in New York was attended by Cohen, Patterson, Mr. James Haber ("Haber"), and Ruble, among others. (*Id.*)  Haber explained investments in paired foreign currency options and how they could be profitable.  (Tr. I at 146-48.)  In general with paired options, one can take a long position and/or a short position in a foreign currency. (Tr. I at 48.)  DGI's investment strategy involved both a long and short option in the foreign

---

[4] Mr. Cohen had nearly 40 years of experience, much of which was spent at Arthur Andersen in Chicago doing audits, tax work, special consulting, cost studies, and construction audits. (Tr. I at 140-42.) After leaving Arthur Andersen in 1982, Mr. Cohen moved to Beaumont, Texas where he formed the accounting firm Pollans & Cohen. In addition to providing clients with audit and tax work, Pollans & Cohen also evaluated investment opportunities for clients.  (Tr. I at 142.)

currency with a certain option period and certain strike prices.[5] (*Id.*) The investment strategy could be profitable, excluding any advisement fees, in one of two ways. (Tr. I at 48-51.) First, if the reference price for the foreign currency options on the option's expiration date fell between the strike prices on the long and short option positions, the investor would make a substantial profit. (*Id.*) Under this scenario, the investor would receive a payment under the long option without having to pay out under the short option. (*Id.*) This was coined the "sweet spot." (*Id.*) DGI did not provide a stated probability of hitting the "sweet spot" to the Taxpayers. (*Id.*) Second, if the reference price on the expiration date was greater than both strike prices, then the investor would receive a payment under the long position, but would also have to pay out under the short position, resulting in a net profit less than if the reference price settled between the strike prices. (*Id.*) If the reference price on the expiration date was less than both strike prices, then the investor would pay nothing and receive nothing. (*Id.*)

The same day in New York, Ruble also met with Patterson and Cohen at DGI's office. (Tr. I at 146-48, 177.) Ruble brought with him a draft, template tax opinion letter describing a similar transaction to the one proposed to Taxpayers. (Tr. 1 at 148.) Ruble went through the opinion with Patterson and Cohen to explain the tax benefits or losses from the transaction and his "legal analysis" of the correct treatment of such benefits. (Tr. I at 147-48.) Ruble confirmed

---

[5] For example, assume that the strike price for the long position was 125.68 in a particular currency and the strike price for the short position was 125.71 for the same currency. (Tr. I at 49.) If, at the end of the option period, the price was 125.68 or greater, then one would be "in the money" with the long position, and, similarly, if it was 125.71 or greater, then one would be "in the money" with the short position. (*Id.*) If the strike price is between 125.68 and 125.71, then it would be in the "sweet spot." (*Id.* at 50-51.) The "sweet spot" is the range where the long option pays and the short option does not pay, in other words, a "home run." (Tr. I at 149.)

that hitting the sweet spot was "a high risk long shot" and that if the options pairs did not "hit all the way" or did not hit the sweet spot, there would be tax losses. (Tr. I at 61-64.)

By October 25, 2001, Roach decided to join the investment scheme, formed his own SMLLC, and funded it with $375,000. (P-Exh. 28 at NPR002020.) Like Nix's and Patterson's SMLLCs, Roach's SMLLC was also managed by DGI. (*Id.*) On October 30, 2001, each Taxpayer purchased two pairs of offsetting foreign currency options, with each paired option being in the same foreign currency with identical expiration dates and almost identical strike prices, through their respective SMLLCs. (P-Exh. 26 at PC 06319; P-Exh. 27 at NPR02188, P-Exh. 28 at NPR002020.) The strike prices of the long and short components of each option pair were set apart by only three pips, "a razor thin" margin.[6] The options were European style options and could be exercised only on their respective expiration dates. On November 8, 2001, the Taxpayers each contributed their SMLLCs, and effectively their paired options, to NPR and received partnership interests in NPR. (P-Exh. 26 at PC 06320; P-Exh. 27 at NPR02189, P-Exh. 28 at NPR002021.) DGI and Alpha were the managers of NPR and on November 1, 2001 each contributed $50,000 to NPR. (*Id.*; Tr. I at 114.)

Nix and Patterson each paid DGI an "advisory fee" of $750,000 and Roach paid DGI a fee of $450,000. (*Id.*; Tr. I at 117; Tr. II at 14, 38.) In addition, Nix and Patterson paid Cohen a fee of $250,000 and Roach paid Cohen a fee of $150,000. (*Id.*) DGI also directly paid Cohen a fee of $325,000 for referring the Taxpayers as clients, which was unknown to the Taxpayers until after the penalties were assessed. (G-Exh. 141; Tr. I at 211-12; Tr. II at 8-9.) In deciding whether to enter into this transaction, Patterson relied upon the representations of Cohen and

---

[6] "Pips" are the smallest unit quoted for any given currency. During any 15 minute time span, the prices quoted by different banks for foreign currencies can vary by more than three pips.

DGI. Nix and Roach relied upon the representations of Cohen and Patterson and even appointed Patterson as their agent to investigate the transactions. (Tr. I at 136, 184, 234-235; Tr. II 4-5, 7, 9, 21-22, 42.) All three Taxpayers relied on Cohen as their fiduciary agent to DGI and the transactions. (*See id.*)

### C.     Decision to Withdraw from the Partnership and Tax Reporting

On December 18, 2001, all three Taxpayers withdrew from NPR. (P-Exh. 26 at PC06320; P-Exh. 27 at NPR002189; P-Exh. 28 at NPR002021; Tr. 1 at 71-73, 248-49; Tr. II at 25-26.) In exchange for their partnership interests, they received cash and foreign currencies representing the fair market value of their interests in NPR as of December 18, 2001. (*Id.*) The Taxpayers then contributed their foreign currencies to a different partnership through which they operated their Law Firm. Inside of the Law Firm, all gains or losses on these foreign currencies were to be specially allocated to their respective contributing partners on the Law Firm's books and tax returns such that the Law Firm's other partners did not receive any gain or loss from these foreign currencies. (Tr. I at 186-190.) The losses from these foreign currency sales were listed in a "Business Risk Division" on the Law Firm's tax returns. (*Id.*) When the foreign currencies were sold in 2001, 2002, and 2003, the Law Firm offset these losses against the income allocated to each Taxpayer to reduce the earned income shown on Schedules K-1 issued to the Taxpayers by the Law Firm. (*See, e.g.*, P-Exh. 6.) The DGI investment scheme was generally described under IRS Notice 2000-44:

> In another variation, a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership. For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher strike price but the same expiration date, for a premium of slightly less than $1,000X. Those option positions are then transferred to a

partnership which, using additional amounts contributed to the partnership, may engage in investment activities.

Under the position advanced by the promoters of this arrangement, the taxpayer claims that the basis in the taxpayer's partnership interest is increased by the cost of the purchased call options but is not reduced under § 752 as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options. Therefore, disregarding additional amounts contributed to the partnership, transaction costs, and any income realized and expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call options ($1,000X in this example), even though the taxpayer's net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero. On the disposition of the partnership interest, the taxpayer claims a tax loss ($1,000X in this example), even though the taxpayer has incurred no corresponding economic loss.

The purported losses resulting from the transactions described above do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165. The purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes.

*See* IRS Notice 2000-44, at 3-4. The Taxpayers engaged in similar transactions and tax reporting as described in IRS Notice 2000-44. As stated previously, when the Taxpayers withdrew from NPR, they received cash and foreign currencies representing the fair market value of their interests in NPR as of December 18, 2001. (P-Exh. 26 at PC06320; P-Exh. 27 at NPR002189; P-Exh. 28 at NPR002021; Tr. 1 at 71-73, 248-49; Tr. II at 25-26.) In their tax returns, the Taxpayers claimed that Section 752 allowed them to increase their tax basis in NPR by the premiums on the contributed long options but did not require them to reduce that basis by the amount they might have to pay on the contributed short options. The foreign currencies received by the Taxpayers upon withdrawal from NPR had a basis materially distinct from their value, and the basis was determined by what the Taxpayers paid for the long option position, while ignoring what the Taxpayers were paid for the short option position. (*See, e.g.*, P-Exh. 6.)

When the Taxpayers resigned from NPR based on Roach's decision to withdraw for personal reasons, the Taxpayers each obtained a thorough, written opinion from Sidley Austin that detailed the proper tax treatment of their investments. (Tr. I at 72-74, 249-250; Tr. II at 25-27.)  In drafting those opinions, Sidley Austin relied on representations made by each of the Taxpayers. (P-Exhs. 17, 18, and 19.)  Each of the Taxpayers believed these representations to be true at the time they were made, and continued to believe them to be true at the time of trial. (Tr. I at 77-78, 252-53; Tr. II at 29.)  Not learned in the area of tax law, the Taxpayers reviewed the Sidley Austin opinions with Cohen. (Tr. I at 81, 250-51; Tr. II at 27.)  After reviewing the Sidley Austin opinions, Cohen concluded that the opinions "had cited the important areas where there might be potential controversy and had adequately dealt with them to [his] satisfaction that [the Taxpayers] would be okay." (Tr. I at 160-61.)  Accordingly, Cohen advised the Taxpayers that they could rely on the opinions because Sidley Austin was a "very well known firm," because the opinions were "very, very well reasoned," and because Ruble was an "acknowledged partnership tax expert." (*Id.*)

### D.     The Notice of Final Partnership Administrative Adjustment (FPAA)

NPR's 2001 tax return was prepared by Grant Thornton LLP and filed with the IRS on or about April 1, 2002.  (P-Exh. 3.)  On line 2 of Schedule B, the return indicates that one of NPR's partners was a partnership.  (*Id.* at 2.)  However, in the same tax return on line 4 of Schedule B, NPR answered "No" to the following question, "Is this partnership subject to the consolidated audit procedures of Sections 6221 through 6223?" (*Id.*)  Sections 6221 through 6223 refer to TEFRA's audit procedures.  In fact, NPR was a partnership subject to the TEFRA audit procedures, and therefore, the answer should have been "Yes."

NPR's return was initially examined by Paul Doerr ("Doerr"), who currently is and was an Internal Revenue Service ("IRS") Agent in 2005. (Tr. II at 117; P-Exh. 2.) Doerr and his managers did not initiate the standard TEFRA procedures, but instead they applied the normal deficiency procedures set forth in Sections 6211 through 6216 and issued a standard Letter 2205 for notifying non-TEFRA partnerships and other taxpayers that their returns have been selected for examination. (P-Exh. 49 at 15, 49.) The IRS notified NPR on March 25, 2005 that it had completed its audit and had determined that no adjustments would be made to NPR's 2001 tax year. (P-Exh. 2.) The March 25, 2005 notice stated:

> We've completed the examination of your tax return for the year(s) shown above. We made no changes to your reported tax.
>
> * * *
>
> This letter is the final notice you'll receive regarding your examination unless you are a shareholder in a subchapter S corporation, a beneficiary of a trust, or a partner in a partnership. We may examine the tax return of a subchapter S corporation, trust, or partnership in which you are involved later and find that we have to make changes to the return. Otherwise, this is the final notice you will receive regarding the examination.

(*Id.*) Doerr signed the notice on behalf of the IRS. (*Id.*) Doerr and his managers initially and mistakenly concluded that there was no need to adjust any of the items on NPR's return. (P-Exh. 49 at 35-36, 48-49, 73.) Instead, they intended to deny the losses related to the Taxpayers' participation in NPR by issuing notices of deficiency directly to NPR's partners under the normal audit procedures. (*Id.* at 35-36.) While under a belief that NPR was not subject to the TEFRA procedures, Doerr issued the March 2005 no-change letter to NPR indicating that no changes were necessary to its return. (*Id.* at 48-49, 73.)

Doerr also prepared deficiency notices denying losses on Patterson's personal tax returns related to both his participation in NPR and losses related to his participation in a separate BLIPS

transaction.[7] (Tr. II at 125-26.) These normal deficiency notices were reviewed by Robert Gee ("Gee") in his capacity as the group manager for all the BLIPS cases across the country. (*Id.*) Gee's knowledge of how other tax shelters worked caused him to ask several questions of Doerr about whether NPR was subject to the TEFRA audit procedures and whether such procedures had been implemented. (*Id.*) Gee concluded that NPR was subject to the TEFRA audit procedures and that it would be necessary for the IRS to issue an FPAA to NPR's partners that contained adjustments to several partnership items on NPR's return. (Tr. II at 125-127; P-Exh. 1.) Gee contacted Penny Schupmann ("Schupmann"), a TEFRA technical advisor, who advised Gee that the IRS could still issue the FPAA because the individual partners' statutes of limitations were still open. (Tr. II at 127-28.) On August 15, 2005, the IRS issued FPAAs prepared and signed by Schupmann to NPR's partners. (P-Exh. 49 at 67-68; P-Exh. 1.)

### E.    Procedural History

On December 6, 2005, NPR filed suit under Section 6226, seeking the redetermination of adjustments made by the IRS to the Form 1065 federal partnership return filed by NPR for its taxable year ending December 31, 2001. The IRS made these adjustments by issuing a Notice of FPAA to NPR on or about August 15, 2005. In the FPAA, the IRS notified NPR of various adjustments made to the Form 1065 partnership tax return and provided various explanations for the adjustments it made. The IRS also determined that NPR was subject to various penalties,

---

[7] BLIPS is an acronym for Bond Linked Issue Premium Structure. (Tr. II at 116.) It is a type of tax shelter involving investors who take out "illegitimate" bank loans to claim tax losses. Like NPR, Klamath Strategic Investment Fund, LLC ("Klamath") is another company that the Taxpayers used for investment purposes, and Klamath invested in BLIPS transactions. Like NPR, Klamath was involved in a TEFRA partnership proceeding in this Court pursuant to Section 6226. *See, generally, Klamath Strategic Investment Fund v. U.S.*, 568 F.3d 537 (5th Cir. 2009), 472 F. Supp. 2d 885 (E.D. Tex. 2007).

including a (i) 40 percent gross valuation misstatement penalty, (ii) 20 percent substantial valuation misstatement penalty, (iii) 20 percent negligence penalty, and (iv) 20 percent substantial understatement penalty. Prior to trial on motion for summary judgment by NPR, the Court ruled that the 40% penalty for gross valuation misstatement and 20% penalty for substantial valuation misstatement do not apply as a matter of law based on the facts of this case. (Dkt. No. 109.) On August 10, 2009, NPR filed its First Amended Petition for Readjustment of Partnership Items Under Internal Revenue Code Section 6226 (the "Amended Petition"). In the Amended Petition, NPR conceded that, if the August 15, 2005 FPAA is valid, NPR did not enter into the transactions at issue with a profit motive, and thus, conceded the adjustments that the IRS made in the FPAA. Thus, the actual adjustments made by the IRS to the tax returns and whether NPR had profit motive are not materially disputed. Rather, the dispute is whether the penalties applied by the IRS are applicable.

## II.     DISCUSSION

Two primary issues were tried before this Court from March 8 through March 10, 2010. The first issue is whether the notice of final partnership administrative adjustment ("FPAA") issued on August 15, 2005 by the IRS is invalid under Section 6223. The second issue is whether the accuracy-related penalties asserted by the Defendant under Section 6662 are applicable in this case because the Taxpayers allegedly relied reasonably and in good faith on the advice of their tax and legal advisors.

### A.     Whether the August 15, 2005 Notice of Final Partnership Administrative Adjustment is Invalid

The first issue is whether the notice of FPAA issued by the IRS on August 15, 2005 with respect to the 2001 tax year of NPR is invalid. NPR argues that the FPAA is invalid because it is

11

the second notice of final partnership administrative adjustment the IRS issued to NPR with respect to its 2001 tax year. According to NPR, a second notice violates Section 6223(f).

### 1. Legal Principles

The Internal Revenue Code contains two different sets of audit procedures. Sections 6211 through 6216 cover general deficiency procedures, while Sections 6221 through 6234 cover the TEFRA audit procedures for certain partnerships. Pursuant to TEFRA, "the tax treatment of any partnership item . . . shall be determined at the partnership level." 26 U.S.C. § 6221. When the IRS seeks to adjust partnership items in such a partnership-level administrative proceeding, TEFRA requires that the IRS give "notice of (1) the beginning of an administrative proceeding at the partnership level with respect to a partnership item, and (2) the final partnership administrative adjustment resulting from any such proceeding." 26 U.S.C. § 6223(a). Thus, under the TEFRA provisions, the Commissioner must give notice to partners of both the beginning and the end of administrative proceedings at the partnership level, with the ending notice being the issuance of an FPAA. *Id.; Harbor Cove Marina Partners Partnership v. Comm'r*, 123 T.C. 64, 78-79 (2004) ("TEFRA requires that respondent notify partners of the beginning and end of partnership-level administrative proceedings."); *see also Desmet v. Comm'r*, 581 F.3d 297, 301-302 (6th Cir. 2009). Section 6223(f) provides that:

> If the Secretary mails a notice of final partnership administrative adjustment for a partnership taxable year with respect to a partner, the Secretary may not mail another such notice to such partner with respect to the same taxable year of the same partnership in the absence of a showing of fraud, malfeasance, or misrepresentation of a material fact.

Neither the Internal Revenue Code nor the regulations promulgated thereunder specify that the required FPAA "notice" take a particular form. *Clovis I v. Comm'r*, 88 T.C. 980, 982 (1987); *see also Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 386 (5th Cir. 1995). "While the

12

Code does not specifically define the FPAA, it is evident from the context, structure and purpose of the applicable Code provisions that an FPAA gives notice of the amount of partnership income properly allocable, in the view of the IRS, to each partner for individual tax purposes." *PAA Management, Ltd. v. U.S.*, 962 F.2d 212, 214 (2d. Cir. 1992). The critical inquiry in determining whether notice of a FPAA has been given by the IRS is whether the notice indicates that it is the final notice and that a determination has been made. *See Clovis*, 88 T.C. at 982 ("whatever form a FPAA takes, it must minimally give notice to the taxpayer that respondent has FINALLY DETERMINED adjustments to the partnership return"); *see also Chomp Associates v. Comm'r*, 91 T.C. 1069, 1073-75 (1988); *Sealy*, 46 F.3d at 386. The mere fact that the FPAA is a "no change" notice does not preclude it from being a valid FPAA. *See University Heights at Hamilton Corp. v. Comm'r*, 97 T.C. 278, 282 (1991). "[A]n FPAA is the functional equivalent of a notice of deficiency." *Sealy*, 46 F.3d at 386. Thus, the Court analyzes the validity of the FPAA in the same way it analyzes the validity of a notice of deficiency. *See id.*

### 2. Analysis

NPR argues that the March 25, 2005 letter was a "notice of . . . the final partnership administrative adjustment" resulting from the IRS's audit of NPR's 2001 tax year. *See* 26 U.S.C. § 6223(a)(2). NPR argues that the March 25, 2005 notice issued by the IRS to NPR constitutes a notice of final partnership administrative adjustment because (i) it explicitly states, in two different places, that it is the "final notice" that the IRS will send regarding the examination and (ii) the IRS satisfied the minimal notice requirements by sending it to the Tax Matters Partner. NPR argues that the notice is unequivocal in indicating that the IRS had completed its audit of NPR with respect to its activities and that the IRS had determined to make

no changes to the NPR return.  NPR argues that the fact that the IRS determined to make no adjustments is not unusual and does not make it any less of a determination.  NPR argues that the March 25, 2005 notice meets all elements of the term "notice of final partnership administrative adjustment" within the meaning of Section 6223: it is a notice, it indicated that it was the final notice, and it indicated that the IRS had determined not to adjust NPR's partnership items.  NPR argues that even Doerr expressly testified that he intended the March 25, 2005, notice to be the final notice to NPR that the IRS had completed its audit and had determined that it would not make any adjustments.  NPR also argues that Government's failure to call Doerr as a witness at trial gives rise to an adverse inference that Doerr's live testimony regarding the March 25, 2005 notice would have been unfavorable to the Government.

The Court finds that the initial FPAA of March 2005 provided adequate or minimal notice to NPR that the IRS had determined adjustments, or the lack thereof, to the partnership return.  There is no dispute that the notice met the statutory requirement for a valid notice of FPAA in that it was mailed to the Tax Matters Partner for the partnership.  *See* 26 U.S.C. § 6223(a).  Further, the Court finds that the initial letter provided notice, indicated that it was the final notice, and indicated that the IRS had determined not to adjust NPR's partnership items. (*See* P-Exh. 2.)  Thus, the Court finds that the March 2005 letter appears to be a valid FPAA notice within the meaning of Section 6223 under the relevant caselaw.  *See Sealy*, 46 F.3d at 386; *Clovis*, 88 T.C. at 982; *Chomp*, 91 T.C. at 1073-75.  Even the Government does not genuinely dispute that it is a valid notice under this caselaw.  Rather, the Government argues that the earlier March 25, 2005 letter was not an FPAA because: (1) FPAAs are issued only after IRS has initiated the TEFRA audit procedures, and the IRS had not initiated TEFRA audit procedures at

14

the time the March 25, 2005 letter was issued; (2) the March 25, 2005 letter was issued by Doerr who did not have authority to issue or sign an FPAA; (3) the March 25, 2005 letter was not intended to be an FPAA; and (4) in the alternative, even if the March 25, 2005 letter is deemed an FPAA, the August 15, 2005 FPAA was allowed under Section 6223(f) because NPR misrepresented that it was not subject to the TEFRA audit procedures on its 2001 partnership return.

The Court rejects the Government's first three arguments. The Court finds no requirement, either by statute or by caselaw, that the validity of a FPAA notice is affected by whether the IRS followed proper internal procedures in issuing the notice or the intent of the agent that provided the notice. *See, e.g.*, *Greenberg's Express, Inc. v. Comm'r*, 62 T.C. 324, 327 (1974) ("As a general rule, this Court will not look behind a notice of deficiency to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making his determinations."); *Riland v. Comm'r*, 79 T.C. 185, 200-01 (1982) (determining that notice was valid even if the revenue agents violated internal procedures as set out in the Internal Revenue Manual); *Selgas v. Comm'r*, 475 F.3d 697, 699-700 (5th Cir. 2007) ("As a general matter, IRS internal operating procedures confer no rights on individual taxpayers . . . ."). Therefore, even assuming without deciding that the IRS failed to follow its internal procedures in issuing the March 2005 notice, this does not affect the validity of the March 2005 notice. Likewise, the Court rejects the Government's argument that because Doerr did not have express authority to issue an FPAA that the March 2005 notice is invalid as a FPAA

notice.[8]  *See, e.g.*, *Selgas*, 475 F.3d at 699-700 (rejecting the argument that a notice is invalid because the employee who signed the deficiency notice lacked authority to do so); *Israel v. Comm'r,* 86 T.C.M. (CCH) 694, 696 (2003) ("petitioner's argument that the person who sent the notices of deficiency did not have the delegated authority to send them has been deemed by this Court to be frivolous").  To hold otherwise would place taxpayers at the impossible position of never knowing whether the received notice is "valid" because of alleged internal procedure violations, despite the fact that it was officially issued, appeared to be proper and according to law, and provided the necessary requirements of a notice of FPAA.  This ruling is consistent with *Sealy*, *Chomp*, and *Clovis I*, in that the critical inquiry in determining whether notice of a FPAA has been given by the IRS is whether the notice indicates that it is the final notice and that a final determination has been made.

The Government's fourth argument has merit, however.  As such, the FPAA issued on August 15, 2005 is valid.  Section 6223(f) allows the IRS to send a second FPAA if there is a showing of either "fraud or malfeasance or misrepresentation of a material fact."  There appears to be no cases that have construed the term "misrepresentation" within the specific context of Section 6223(f).  Both parties cite decisions that construe "misrepresentation" in other statutory contexts, but these decisions are unpersuasive as to this specific statute.  The term "misrepresentation" is defined as "the act of making a false or misleading assertion about something, usually with the intent to deceive" and as "an assertion that does not accord with the facts."  *See* Black's Law Dictionary 1091 (9th ed. 2009).  Black's Law Dictionary additionally

---

[8] This is further reinforced by the fact that the Government did not call Doerr as a witness at trial despite knowing that his testimony was directly relevant to the issue of the validity of the notices.  As the IRS employee who prepared the March 25, 2005 notice, Doerr was in the best position to relate the factual issues surrounding it.

provides definitions for the terms "fraudulent misrepresentation," "innocent misrepresentation," "material misrepresentation," and "negligent misrepresentation," implying that a "misrepresentation," by itself, necessarily need not be fraudulent or intentional. *See id.* In other words, the term "misrepresentation" is broad enough to describe a fraudulent as well as a negligent or innocent statement. The statutory language is written in the disjunctive, meaning that if there is "fraud" or "malfeasance" or a "misrepresentation of a material fact," then a second FPAA can be mailed. In other words, if the taxpayers submitted a material fact that was false, then this exception applies. The Court finds that there is no evidence indicating that the inconsistent answers on NPR's tax return were intentional or fraudulent. However, the misrepresentation in this case was material and it related directly to the proper audit procedures that should have been originally applied to the tax return. As such, the Court concludes that the IRS is entitled to invoke this exception and send a second FPAA. To hold otherwise would prevent the IRS from relying upon submitted information in tax returns in preparing notices and would place an impermissible burden on the IRS to verify the accuracy of the submitted information and the intent with which it was submitted.

There is no dispute that, and the Court finds that, the tax return filed by NPR erroneously failed to check a box that indicated that NPR was subject to the TEFRA provisions. The Court finds that Doerr mistakenly took actions as though NPR was a non-TEFRA partnership, applied the normal deficiency procedures set forth in Sections 6211 through 6216, and issued a standard non-TEFRA closing letter. The Court finds that Doerr was under the mistaken impression that NPR was not subject to the TEFRA audit procedures at the time he issued the March 25, 2005 no-change letter and that there was no need to adjust any of the items on NPR's return. The

Court finds that had NPR correctly checked the box indicating that the tax return was subject to the TEFRA provisions that it is probable that the IRS would not have issued the March 25, 2005 no-change letter. The Court rejects NPR's arguments that it was unreasonable for the IRS to treat NPR as a non-TEFRA partnership. Further, the Court rejects NPR's arguments that seek to impose a "justifiable reliance" requirement into the statute. No such requirement is imposed by the statute. However, to the extent that reliance is required, the Court finds that the IRS relied on NPR's misrepresentation regarding its TEFRA classification when issuing the March 25, 2005 letter. At the very least, NPR's misrepresentation created conflicts on NPR's 2001 return and temporarily confused Doerr and his managers. For these reasons, the Court finds that the misrepresentation by NPR was a "material fact." By the express language of Section 6223(f), a second FPAA notice can issue. Thus, the Court finds that the August 15, 2005 notice of FPAA is valid.

## B.    The Accuracy Related Penalties

This Court has jurisdiction to determine the applicability of any penalty which relates to an adjustment to a partnership issue pursuant to 26 U.S.C. § 6226(f). There are two accuracy-related penalties asserted by the Government that are still in dispute in this case:[9] a 20% penalty for substantial understatement of income tax under Section 6662(b)(2) and (d) and a 20% penalty for negligence or disregard of rules and regulations under Section 6662(b)(1). The Court now addresses the applicability of the penalties.

---

[9] As mentioned previously, the Government originally asserted four accuracy-related penalties, but two of those were resolved by the Court on motion for summary judgment. (*See* Dkt. No. 109.) Only the 20% negligence and substantial understatement penalties are in dispute.

### 1. Substantial Understatement of Income Tax

In the August 15, 2005 FPAA, the IRS imposed a penalty for substantial understatement of income tax.  The Court now turns to this penalty.

### a.     Legal Principles

Section 6662(b) imposes a 20% penalty to "[a]ny substantial understatement of income tax." 26 U.S.C. § 6662(a), (b)(2).   "For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $5,000."  26 U.S.C. § 6662(d)(1)(A). The amount of the substantial understatement used to compute the penalty does not include any item for which there was substantial supporting authority.  26 U.S.C. § 6662(d)(2)(B)(i); Treas. Reg. § 16662-4(a).

"The substantial authority standard is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard."  Treas. Reg. § 1.6662-4(d)(2).  For substantial authority to exist, "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662-4(d)(3)(i). Opinions rendered by tax professionals are not authority. Treas. Reg. § 1.6662-4(d)(3)(iii).  The authorities underlying such opinions, if applicable to the facts of a particular case, may give rise to substantial authority for the tax treatment of an item. *Id.*  In addition, in a case involving a tax shelter, the "substantial authority" exception does not apply unless the "taxpayer reasonably believed that the tax

treatment of such item by the taxpayer was more likely than not the proper treatment." 26 U.S.C. § 6662(d)(2)(C)(i)(II).[10] A "tax shelter" includes, among other things, a partnership or an investment plan "if a significant purpose of such ... is the avoidance or evasion of Federal income tax." 26 U.S.C. § 6662(d)(2)(C)(iii).

### b. Parties' Arguments

The Government argues that the facts satisfy the mathematical test for the penalties because the amount of understatement was greater than 10 percent of the required tax. *See* 26 U.S.C. § 6662(d)(1)(A). As a result, the Government urges that the penalty applies in this case. The Government argues that the Taxpayers' reliance on the caselaw is misplaced. The Government argues that the Taxpayers knew this was a tax shelter listed in Notice 2000-44, yet decided to enter into the transactions nonetheless. NPR argues that the 20% substantial understatement of income tax penalty does not apply in this instance. NPR argues that there was "substantial authority" for the treatment of the Taxpayers' tax positions. NPR contends that the input and advice of Cohen and Sidley Austin provide substantial authority for the tax treatment at issue. NPR argues that it is not a tax shelter, but even if it were, the substantial-authority exception would still apply. NPR argues that the advice given to the Taxpayers by Cohen and Sidley Austin justifiability relied on the existing case law and strongly supported NPR's position that their tax position was, more likely than not, correct.

### c. Analysis

This Court may assume, *arguendo,* that the NPR partnership was a tax shelter within the

---

[10] Paragraph C of Section 6662 was amended by Pub. L. 108-357, § 812(d), on October 22, 2004. The references to paragraph C in this opinion are to the former version of the statute, which existed at the time the transactions were entered into and the tax opinions were written.

definition. The record, however, supports a finding that substantial authority existed. The Taxpayers obtained comprehensive opinions of counsel before they filed their returns. The Sidley Austin opinions relied on the relevant authority at the time. Cohen went over the opinions with the Taxpayers and confirmed that they were reasonable. Further, Mr. Stuart Smith ("Smith") provided expert opinion and testimony that substantial authority supported the tax treatment at issue in this case. Smith's experience includes over 40 years as a tax lawyer, both as Tax Assistant to the Solicitor General in the Department of Justice and now in private practice. (Tr. II at 60-61.) After examining the material issues identified in the opinions, Smith concluded that the opinions provided "objectively reasonable tax advice" because they "discussed all of the authorities in an even-handed balanced way, taking into account all possible challenges in a thorough and complete manner." (Tr. II at 77.) He further concluded that the opinions were the "quality and character upon which a taxpayer could rely in good faith." (*Id.*) The Court agrees with Smith's opinions and concludes that the Sidley Austin opinions provided "substantial authority" for the Taxpayers' treatment of their basis in their respective partnerships. The record also supports a finding that the Taxpayers reasonably believed that the tax treatment applied to the transactions was "more likely than not" the proper treatment. Although they are experienced attorneys, the Taxpayers are not tax lawyers. Based on all of the record evidence, the Court finds that the Taxpayers were not aware of any financial agreements between Cohen and DGI when they decided to enter the transactions and when they filed their returns. (Tr. II at 8-9.) The Taxpayers believed that Cohen was properly discharging his duties as their fiduciary. The Taxpayers sought advice from Cohen before deciding to enter these transactions and relied heavily upon his advice. The Taxpayers sought to make a profit from the investment plan when

they entered the pertinent transactions, even if NPR did not. Accordingly, the Court finds that the substantial understatement penalty does not apply.

### 2. Negligence

In the August 15, 2005 FPAA, the IRS also imposed a penalty for negligence. The Court now turns to this penalty.

### a. Legal Principles

The 20% negligence penalty applies to the extent that an understatement of the tax was attributable to the taxpayer's "negligence or disregard of rules or regulations." 26 U.S.C. § 6662(b)(1). "For purposes of this section, the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard" of the tax laws. 26 U.S.C. § 6662(c). Negligence includes the "failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b)(1). "Negligence is strongly indicated where ... [a] taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances." Treas. Reg. § 1.6662-3(b)(1)(ii). Disregard for the "rules or regulations is 'careless' if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation." Treas. Reg. § 1.6662-3(b)(2). The Fifth Circuit defines negligence as "any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances." *Heasley v. Comm'r,* 902 F.2d

380, 383 (5th Cir. 1990).

A taxpayer is not negligent where there is a reasonable basis for the position taken. Treas. Reg. § 1.6662-3(b)(1). "Reasonable basis is a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. The reasonable basis standard is not satisfied by a return position that is merely arguable or that is merely a colorable claim." Treas. Reg. § 1.6662-3(b)(3). Reasonable basis requires reliance on legal authorities and not on opinions rendered by tax professionals. *Id.;* Treas. Reg. § 1.6662-4(d)(3)(iii). The Court may, however, examine the authorities relied upon in a tax opinion to determine if a reasonable basis exists. *See* Treas. Reg. § 1.6662-4(d)(3)(iii). "If a return position is reasonably based on one or more of the authorities set forth in [the substantial authority section] . . . the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662-4(d)(2)." Treas. Reg. § 1.6662-3(b)(3).

**b.      Parties' Arguments**

The Government argues that entering into a transaction that is "too good to be true" is careless and not what a reasonable person would do. The Government argues that the Taxpayers had full knowledge of their advisors' conflicts of interest. The Government argues that a reasonable, prudent person would not proceed with a transaction that was the subject of an IRS penalty warning without obtaining completely independent advice. NPR argues that case law provided ample support for the Taxpayers' return positions and that the Taxpayers had a reasonable basis for their positions. NPR argues that the Taxpayers' reporting positions were consistent with the IRS' internal position that option positions do not create liabilities within the meaning of Section 752. Thus, NPR argues that they were not negligent.

### c.      Analysis

The reasonable basis standard is less stringent than the substantial authority standard; if the substantial authority defense is applicable to the substantial understatement penalty, the reasonable cause defense will also be applicable.  *See* Treas. Reg. § 1.6662-4(d)(2); Treas. Reg. § 1.6662-3(b)(3).  As discussed above, the Court finds that there was "substantial authority" to rely on the Sidley Austin opinions.  *Id.*  Therefore, the "reasonable basis" standard has also been met.  Accordingly, a penalty for negligence is not applicable in this case.

## C.      Reasonable Cause and Good Faith Defense

Finally, the Court turns to the reasonable cause and good faith issues.  Notwithstanding the specific requirements of the penalties discussed above, a taxpayer may defeat the imposition of any of those penalties if he demonstrates reasonable cause.

### 1.   Legal Principles

Section 6664(c)(1) provides an absolute defense to any accuracy-related penalty. A taxpayer that would otherwise be subject to a twenty-percent accuracy-related penalty under § 6662(b) is not liable if the taxpayer can demonstrate that the underpayment was made with reasonable cause and the taxpayer acted in good faith.  26 U.S.C. 6664(c)(1); Treas. Reg. § 1.6664-4(a).  The plaintiffs bear the burden of production and proof on their reasonable cause defenses. *Klamath Strategic Investment Fund v. U.S.*, 568 F.3d 537, 548 (5th Cir. 2009); s*ee Montgomery v. Commissioner,* 127 T.C. 43, 66 (2006). Although each instance requires a case-by-case determination of all pertinent facts and circumstances, generally the most important factor in assessing the applicability of the exception is the amount of effort the taxpayer spent to determine the proper tax liability in light of all the circumstances. Treas. Reg. § 1.6664-4(b).

When considering the taxpayer's effort to determine the proper tax liability, the taxpayer's reliance on the advice of a professional tax adviser may not be sufficient to demonstrate reasonable cause and good faith. Treas. Reg. § 1.6664-4(b)(1). Rather, the validity of the reliance turns on "the quality and objectivity of the professional advice which they obtained." *Klamath*, 568 F.3d at 548, *citing Swayze v. U.S.,* 785 F.2d 715, 719 (9th Cir. 1986). "Reliance on . . . professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Treas. Reg. § 1.6664-4(b)(1). To determine if reliance on a tax professional's advice was reasonable and in good faith, all facts and circumstances must be taken into account. Treas. Reg. § 1.6664-4(c). "For example, the taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith." *Id.* "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Treas. Reg. § 1.6664-4(b)(1). A taxpayer is not required to challenge the advisor's conclusions, seek a second opinion, or check the advice himself. *U.S. v. Boyle,* 469 U.S. 241, 250-51 (1985). "To require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place." *Id.* at 251.

In order to establish reasonable reliance in good faith on the advice of a tax professional, a taxpayer must establish that all facts and circumstances were considered, and no unreasonable assumptions were made. Treas. Reg. § 1.6664-4(c)(1)(i)-(ii). For the advice to be based on

"[a]ll the facts and circumstances," it must include all pertinent facts and circumstances, including "the taxpayer's purposes (and the relative weight of such purposes) for entering into a transaction and for structuring a transaction in a particular manner." Treas. Reg. § 1.6664-4(c)(1)(i). Additionally, "[t]he advice must not be based on unreasonable factual or legal assumptions (including assumptions as to future events) and must not unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." Treas. Reg. § 1.6664-4(c)(1)(ii). "The fact that these requirements are satisfied, however, will not necessarily establish that the taxpayer reasonably relied on the advice (including the opinion of a tax advisor) in good faith." Treas. Reg. § 1.6664-4(c)(1).

## 2. Parties' Arguments

The Government argues that the Taxpayers' clear objective from the outset was to report these tax shelter transactions in a manner so as to conceal the tax losses and avoid their detection by the IRS. The Government argues that NPR's, the Law Firm's, and the Taxpayer's individual tax returns were replete with false and misleading reporting. The Government argues that the Taxpayers did not exercise reasonable care with these transactions. The Government argues that the Taxpayers sought penalty protection, not independent legal advice, where it was apparent that the advisors were tainted by conflicts of interest. The Government also argues that the Taxpayers were unreasonable in relying upon the obtained advice and opinions. The Government argues that there is no evidence that supports a reasonable belief of a reasonable chance of making a profit with the transactions. The Taxpayers argue that they did not hide the transactions, that they reasonably relied upon their advisors, that any potential conflicts of interest did not make their reliance unreasonable, and that they reasonably believed that they

could earn a profit in the transactions.

### 3. Analysis

Messrs. Nix, Patterson, and Roach are not tax lawyers, and they have no expertise in tax matters. Instead, they rely on qualified, professional advisors for tax advice. Because of the complexity of the tax treatment, it was necessary for the Taxpayers to seek advice from qualified tax attorneys concerning the applicable law to the facts of their investment and the resulting tax effects. The Taxpayers initially relied upon Cohen, their personal CPA at Pollans & Cohen. Cohen introduced them to Ruble, who was a tax expert on partnership matters with the law firm Sidley Austin. Patterson asked Ruble whether there was a conflict of interest and, after a series of questions to Ruble, became assured that there was not a conflict of interest. (Tr. I at 60-61.) Based on all of the record evidence, the Court finds that the Taxpayers were not aware of any financial agreements between Cohen and DGI when they decided to enter the transactions and when they filed their returns. (Tr. II at 8-9.) The Taxpayers believed that Cohen was properly discharging his duties as their fiduciary. Based in large part on the advice of Cohen, the Taxpayers ultimately decided to invest in the transactions in dispute. The Court finds that the Taxpayers had a reasonable belief that they could make a profit with the transactions. When the Taxpayers resigned from NPR, the Taxpayers each obtained a thorough, written opinion from Sidley Austin that detailed the proper tax treatment of their investments. (Tr. I at 73-74, 250-51; Tr. II at 25-27.) Not being learned in tax law, the Taxpayers reviewed these opinions with Cohen. (Tr. I at 81, 251; Tr. II at 27.) The advice given to the Taxpayers by Sidley Austin and Cohen relied on the existing case law and strongly supported NPR's position that the Taxpayers' tax position was "more likely than not" correct. NPR's tax expert Smith also concluded that the

27

opinions complied with standards common to the profession and with administrative standards established by Treasury Circular 230, which addresses conduct of practitioners who provide tax opinions. Smith further concluded that the opinions reached objectively reasonable conclusions. The detailed opinions provided a reasonable interpretation of the law. Based on the opinions they received from Sidley Austin that provided an objectively reasonable explication of the law as it then existed, as confirmed by Smith's trial testimony, the Taxpayers' belief that their tax treatment of their investments in NPR was reasonable. The Court finds that such reliance was reasonable and that the Taxpayers relied upon this advice in good faith. The Court rejects the Government's arguments to the contrary.

In short, the Taxpayers acted reasonably and in good faith in relying on their tax advisors' advice with respect to their investments in the underlying transactions. As aptly stated by Mr. Nix at trial, "at every step, we followed the advice of people we relied on, people who were supposed to have known what they were doing and did know what they were doing. And what else could we have done except follow their advice?" (Tr. II at 32-33.) The Court finds that the Taxpayers have proven, by a preponderance of the evidence, their good faith in relying on the advice of qualified tax accountants and tax lawyers. Accordingly, the criteria under the reasonable cause exception of 26 U.S.C. § 6664(c) is satisfied, and the Taxpayers are not liable for accuracy-related penalties.

## III.    CONCLUSION

The Court finds that the August 15, 2005 notice of FPAA is valid.  The Court also finds that no penalties are applicable.  The parties are directed to confer and submit, within 15 days, a proposed form of judgment (agreed if possible) consistent with this opinion.

IT IS SO ORDERED.

SIGNED this 10th day of August, 2010.

_____

T. JOHN WARD
UNITED STATES DISTRICT JUDGE